UNITED STATES DISTRICT COURT         EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| STEPHANIE J. OUBRE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| versus | § | CIVIL ACTION NO. 1:25-CV-188 |
| | § | |
| THE DOW CHEMICAL COMPANY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the court is Plaintiff Stephanie J. Oubre's ("Oubre") Motion to Compel Discovery Responses (#23), wherein Oubre asks the court to compel the production of evidence relevant to the verification of the stated basis for Oubre's termination of employment by Defendant The Dow Chemical Company ("Dow"). Dow filed a Response (#24), and Oubre filed a Reply (#25). Having considered the pending motion, the pleadings, and the applicable law, the court is of the opinion that the motion should be granted.

I.    Background

The present case arises from Dow's termination of Oubre after nearly thirty years of employment. In May of 1995, Oubre began her career at the Sabine River plant ("the plant") in Orange, Texas. Following a series of mergers, Dow took over as Oubre's employer. For decades, Oubre worked with the plant's Analytical Technician team and received awards for her work at Dow. According to the Complaint (#1), Oubre was continually commended for her outstanding work performance, served on various Plant Leadership teams, repeatedly acknowledged for the quality of her work, worked all technician shifts, fulfilled all overtime requests, collaborated to build teams, restored lab and customer functions, and maintained the

highest levels of knowledge and expertise.  As a result of her service, Oubre was frequently assigned to train new Analytical Technicians.  Moreover, Oubre was annually among the highest wage earners due to her seniority and willingness to accommodate the plant's overtime needs.

Despite her allegedly sterling record, in a letter dated November 7, 2024 ("Last Chance Letter"), Oubre was informed that she committed a very serious infraction.  Specifically, the Last Chance Letter states as follows:

> On the night shift of October 2, 2024, the Analyst[1] working in the [Melt Index ("MI")] group informed C unit operations that the MI instruments were not calibrated.  As a result, the day staff needed to address this issue, and the MIs could not be operated.  This incident led to a $3,000 loss for the company because the unit could not proceed to quality until the SQC[2] data for the instrument was verified.  The logbook was edited twice after this incident with different statements, which is not acceptable according to the Analytical Logbook Policy.
>
> Another incident occurred on the night shift of October 13, 2024, where a TOC[3] sample was only tested for pH.  A UPE[4] was entered for this incident, and the Analyst came in on their day off on the evening of October 14, 2024, to modify the logbook comment, which is not acceptable according to the Analytical Logbook Policy.
>
> . . .
>
> This is your last chance.  If any policy or rule violations or work-related misconduct occur within twenty-four months from this date, you could be discharged from the company immediately. . . .

The Last Chance Letter was signed by LeShea Njigha ("Njigha"), Oubre's immediate supervisor and Analytical Operations Leader.  In late January 2025, Njigha identified an additional alleged

---

[1] In the context of the Last Chance Letter, the "Analyst" refers to Oubre.

[2] SQC stands for Statistical Quality Control.

[3] TOC stands for Total Organic Carbon.

[4] A UPE is an "unexplained event."

infraction by Oubre—failure to perform an Analytical Work Request ("AWR") Caplin test—which Njigha characterized as a violation of the Last Chance Letter.  An Employment Review Meeting ("ERM") was then initiated, and Njigha presented the ERM decision-making team with records that she felt supported termination.  According to Njigha's testimony, the ERM team, of which she was a part, made the termination decision based on the records and information that was presented in the ERM.

On January 30, 2025, Oubre, then age 57, was instructed by Dow's Senior Analytical Leader to attend a "neutral meeting" without further clarification.  During the meeting, Oubre was told that she was "suspended" and was escorted to the plant's gate where she was told to contact her supervisor for an explanation of her suspension.  Oubre called Njigha from the plant's parking lot and was told only that she would be contacted regarding when to return to the plant.  Around February 3, 2025, Oubre was contacted and again told to attend a "neutral meeting" within the hour.  During the second meeting, Oubre was told that she had a choice to retire or be terminated.  Oubre was also informed that she had one day to decide.  Startled and concerned about the loss of her wages and nearly thirty years of accrued benefits, Oubre alleges that she believed she had no reasonable alternative but to retire.  Dow completed the "constructive discharge" the next morning and Njigha immediately announced to all of Oubre's fellow Analytical Technician team members that Oubre had decided to retire.

On March 22, 2025, Oubre filed a complaint with the Texas Workforce Commission Civil Rights Division and the Equal Employment Opportunity Commission ("EEOC") claiming that her constructive discharge was intentional, willful, and malicious age discrimination.  On April 22, 2025, Oubre received a Notice of the Right to File a Civil Action.  Oubre filed the present case

on April 22, 2025, asserting that Dow violated the Texas Commission on Human Rights Act, which prohibits an employer from committing adverse employment actions against an individual with age as a motivating factor. Oubre maintains that the allegations contained within the Last Chance Letter and purported failure to complete the AWR Caplin test were untruths and pretexts for age discrimination. On March 20, 2026, Oubre filed a Motion to Compel Discovery Responses (#23), requesting that Dow be required to produce the OCS Black Specs Results data sheets with photos for the Log-In Group for October 2 and 3, 2024, as well as the ERM file. Dow filed a Response (#24) and Oubre filed a Reply (#25).

II.    Analysis

Pursuant to Federal Rule of Civil Procedure 26(b)(1):

> Unless otherwise limited by court order . . . [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

FED. R. CIV. P. 26(b)(1). "[D]iscovery rules are to be accorded a broad and liberal treatment to effect their purpose of adequately informing the litigants in civil cases." *Herbert v. Lando*, 441 U.S. 153, 177 (1979) (Powell, J., concurring); *accord Mitnor Corp. v. Club Condos.*, 339 F.R.D. 312, 319 (N.D. Fla. 2021); *Torrey v. Infectious Diseases Soc'y of Am.*, 334 F.R.D. 79, 83 (E.D. Tex. 2019). "[C]ontrol of discovery is committed to the sound discretion of the trial court." *In re S. Recycling, L.L.C.*, 982 F.3d 374, 386 (5th Cir. 2020) (quoting *Williamson v. U.S. Dep't of Agric.*, 815 F.2d 368, 382 (5th Cir. 1987)); *accord Manuel v. Turner Indus. Grp., L.L.C.*, 905

4

F.3d 859, 872 (5th Cir. 2018) (quoting *Smith v. Potter*, 400 F. App'x 806, 813 (5th Cir. 2010));

*Freeman v. United States*, 556 F.3d 326, 341 (5th Cir. 2009).

District courts have wide discretion to determine the scope of discovery.  *See Cruz v. Maverick County*, 957 F.3d 563, 570 (5th Cir. 2020); *Shumpert v. City of Tupelo*, 905 F.3d 310, 326 (5th Cir. 2018).  At the discovery stage, relevance is broadly construed, and information is considered relevant if it "encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)); *accord Leonard v. Martin*, 38 F.4th 481, 489 (5th Cir. 2022) ("Under [Rule 26(b)(1)], information is relevant if it 'bears on, or that reasonably could lead to other matters that could bear on, any issue related to the claim or defense of any party.'" (quoting *Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir. 1991))); *Bavely, Tr. of AAA Sports, Inc. v. Panini Am., Inc.*, No. 4:22-CV-093, 2023 WL 3686806, at *1 (E.D. Tex. Jan. 27, 2023); *Nafta Traders, Inc. v. ADIDAS Am., Inc.*, No. 3:19-CV-00915-N, 2023 WL 114703, at *2 (N.D. Tex. Jan. 4, 2023); *Camoco, LLC v. Leyva*, 333 F.R.D. 603, 606 (W.D. Tex. 2019).  *But see Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512-WCB, 2017 WL 319064, at *4 n.4 (E.D. Tex. Jan. 23, 2017) (noting that "Rule 26 was amended to delete from the definition of relevance information that appears 'reasonably calculated to lead to the discovery of admissible evidence' because '[t]he phrase has been used by some, incorrectly, to define the scope of discovery' and 'has continued to create problems' given its ability to 'swallow any other limitation on the scope of discovery.'" (quoting FED. R. CIV. P. 26 advisory committee's note to 2015 amendment)).

In order for information to be discoverable, it "must be both relevant and proportional to the needs of the case—which are related but distinct requirements." *Zenith Ins. Co. v. Tex. Inst. for Surgery, L.L.P.*, 328 F.R.D. 153, 161 (N.D. Tex. 2018) (quoting *Samsung Elecs. Am., Inc. v. Chung Yang Kun*, 321 F.R.D. 250, 279 (N.D. Tex. 2017)); *accord Baker v. Walters*, 652 F. Supp. 3d 768, 778 (N.D. Tex. 2023) (citing FED. R. CIV. P. 26(b)(1)). "To be relevant under Rule 26(b)(1), a document or information need not, by itself, prove or disprove a claim or defense or have strong probative force or value." *Baker*, 652 F. Supp. 3d at 778 (quoting *Samsung Elecs. Am., Inc.*, 321 F.R.D. at 280); *accord Zenith Ins. Co.*, 328 F.R.D. at 161. The party resisting discovery has the burden to show specifically how each discovery request at issue is not relevant or is overly broad, unduly burdensome, or oppressive. *English v. Tex. Farm Bureau Bus. Corp.*, No. 617CV00323-ADA-JCM, 2020 WL 2764625, at *1 (W.D. Tex. May 27, 2020); *see Baker*, 652 F. Supp. 3d at 774 (citing *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990)); *United States v. 5.934 Acres of Land, More or Less,* 635 F. Supp. 3d 553, 556 (S.D. Tex. 2022); *Samsung Elecs. Am., Inc.*, 321 F.R.D. at 284. Moreover, "[t]he burden is on the party resisting discovery to establish the discovery is not proportional." *Hall v. Rent-A-Center, Inc.*, Civ. A. No. 4:16cv978, 2018 WL 4293141, at *3 (E.D. Tex. Aug. 31, 2018); *accord Samsung Elecs. Am. Inc.*, 325 F.R.D. at 591-92 (holding that the party resisting discovery on the grounds that it is not proportional to the needs of the case "bears the burden of making a specific objection and showing that the discovery fails the proportionality calculation mandated by Federal Rule of Civil Procedure 26(b) by coming forward with specific information to address—insofar as that information is available to it—the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the

parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit").

Local Rule CV-26 of the Eastern District of Texas provides additional guidance to parties regarding discoverable information.   Specifically, Rule CV-26 provides that discovery encompasses the following matters:

(d)   Relevant to Any Party's Claim or Defense.  The following observations are provided for counsel's guidance in evaluating whether a particular piece of information is relevant to any party's claim or defense:

(1)   it includes information that would not support the disclosing parties' contentions;

(2)   it includes those persons who, if their potential testimony were known, might reasonably be expected to be deposed or called as a witness by any of the parties;

(3)   it is information that is likely to have an influence on or affect the outcome of a claim or defense;

(4)   it is information that deserves to be considered in the preparation, evaluation, or trial of a claim or defense; and

(5)   it is information that reasonable and competent counsel would consider reasonably necessary to prepare, evaluate, or try a claim or defense.

E.D. TEX. CIV. R. 26(d).

"Counsel have an obligation, as officers of the court, to assist in the discovery process by making diligent, good-faith responses to legitimate discovery requests." *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) (quoting *McLeod*, 894 F.2d at 1485).  A party may submit a motion to compel disclosure of discovery if "the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." FED.

R. CIV. P. 37(a)(1). Nevertheless, district courts have broad discretion in all discovery matters and should not "hesitate to exercise appropriate control over the discovery process." *Herbert*, 441 U.S. at 177; *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000); *accord Bennett v. Hartford Ins. Co. of Midwest*, 890 F.3d 597, 603 (5th Cir. 2018) (recognizing that district courts have broad discretion on discovery issues).

A.    OCS Black Specs Results Data Sheets

Oubre first requests that the court compel Dow's production of the OCS Black Specs data sheets with photos for the Log-In Group for October 2 and 3, 2024. Oubre argues that the evidence is relevant to the resolution of a central element of the case: the identification of the stated basis of Oubre's termination and the veracity of Dow's stated basis for her termination. Oubre maintains that Dow's reason for terminating her employment—the allegations contained within the Last Chance Letter and purported failure to complete the AWR Caplin test—were untruths and pretexts for age discrimination. Contrary to the Last Chance Letter's accusations, Oubre contends that the MI Data Sheets and Njigha's deposition testimony show that Oubre did in fact perform the MI tests. Moreover, Dow's discovery responses revealed that Njigha knew that Oubre had performed the MI tests, even before the Last Chance Letter was written. In light of the foregoing evidence, Oubre argues that Dow's stated basis for her termination has morphed throughout litigation. According to Oubre, instead of maintaining that Oubre did not run the MI test, as was alleged in the Last Chance Letter, Dow now contends that Oubre caused delay by telling the Operators that the MI test numbers could not be trusted.

Oubre now seeks the data sheets at issue to show that the Analytical Technician group that had the instrument problems and did not run their tests during the subject shift was the Login

Analytical Technician Group, not Oubre's group.  Oubre states that this evidence is relevant because it will make Dow's explanation of the termination decision and Oubre's showing that it is an untruthful pretext more or less probable.

> When the data sheets were initially requested by Oubre, Dow answered as follows:
>
> Dow objects to this request because it is overbroad, unduly burdensome, and seeks documents that are not relevant to any of Plaintiff's claims or Dow's defenses. Dow also objects because this request appears to be a fishing expedition to obtain documents irrelevant to Plaintiff's claims.  Dow will not produce documents responsive to this request.

In response to Oubre's motion, Dow argues that the requested documents pertain to other work groups at Dow with which Oubre had no involvement.  Further, Dow avers that such documents would not tend to show that Oubre faced any unlawful treatment based on her age, or that Dow's proffered reason for Oubre's discipline was false.  Rather, the documents would only go to show that there was potentially another problem in a different group at Dow on the same night that Oubre engaged in misconduct and then falsified records to cover it up.

The court finds that the requested documents, the OCS Black Specs data sheets with photos for the Log-In Group for October 2 and 3, 2024, are relevant to the case.  Evidence that another group failed to run certain tests on the same night Oubre was accused of not running the MI tests could be probative of disparate treatment and pretext, which Oubre may be required to prove in order to prevail on her claim.  *See Wallace v. Seton Fam. of Hosps.*, 777 F. App'x 83, 89 (5th Cir. 2019) (explaining that once a prima facie case is established, and the defendant offers a legitimate, non-discriminatory reason for the adverse action, the plaintiff must prove intentional discrimination, which may be accomplished by showing the proffered reason is pretextual).  If similarly situated employees failed to complete their assigned tests but were not disciplined, that

disparity supports an inference of discrimination by suggesting that Oubre was treated differently for comparable conduct. *See Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("Disparate treatment of similarly situated employees is one way to demonstrate unlawful discrimination and retaliation."). Furthermore, if those employees were significantly younger than Oubre, her age discrimination claim would be strengthened. Conversely, if those employees were disciplined in the same manner as Oubre, such evidence would undermine her claim that the stated reason for her termination was a pretext for age discrimination. Accordingly, the information contained in the requested data sheets could reasonably lead to the discovery of evidence relevant to Oubre's claims or Dow's defenses.

    B.    <u>The ERM File</u>

Oubre additionally requests that Dow be compelled to produce the ERM File[5] displayed during the meeting that led to her termination. In preparation for the ERM, Njigha created a PowerPoint presentation containing evidence she believed supported a decision to terminate Oubre's employment, including information regarding instances of alleged misconduct. According to Njigha, she sent a digital copy of the PowerPoint to Human Resources ("HR"), but not to Legal.[6] During the ERM meeting, Njigha gave a PowerPoint presentation and discussed the information displayed on the slides with the team members, which included "HR Legal, the HR partner, the leader, as well as a neutral leader."[7] The ERM team allegedly based its decision to

---

[5] According to Oubre's motion and Dow's privilege log, it appears that the ERM File is a PowerPoint dated January 27, 2025.

[6] Based on deposition testimony from another Dow representative, the PowerPoint was sent to HR Legal.

[7] Njigha was the "leader" in Oubre's ERM, as she was her direct supervisor.

terminate Oubre's employment on the information presented by Njigha.  Oubre therefore contends that the court and jury are entitled to review the materials presented to the ERM team that precipitated the termination of her employment.  Oubre further contends that the ERM File is clearly relevant and central to determining the veracity of Dow's purported reasons for Oubre's termination.  In addition, Oubre avers that the ERM File is not covered by attorney-client privilege, as it was not turned over to Legal, and it was created for review by the ERM team in the termination decision-making meeting.  Dow, however, maintains that the ERM File is squarely covered by the attorney-client privilege because the ERM PowerPoint was prepared for Dow's legal counsel to provide advice regarding any proposed action relating to Oubre's employment.

The attorney-client privilege narrows the otherwise broad disclosure requirements imposed by Federal Rule of Civil Procedure 26.  *Equal Emp. Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d 690, 695 (5th Cir. 2017).  In the corporate context, attorney-client privilege is extended to those communications between employees and corporate counsel, as it is frequently the employees who possess the information needed by the corporation's lawyers.  *Upjohn Co. v. United States*, 449 U.S. 383, 391-94 (1981); *United States v. Brown*, 151 F.4th 647, 658 (5th Cir. 2025).  "Communication between employees and the corporation's attorney is privileged if it is made 'at the direction of corporate superiors in order to secure legal advice from counsel' concerning 'matters within the scope of the employees' corporate duties.'"  *Adams v. Mem'l Hermann*, 973 F.3d 343, 349 (5th Cir. 2020) (quoting *Upjohn*, 449 U.S. at 394).  Determining whether the privilege applies is a highly fact-specific inquiry wherein the proponent "must prove: (1) that he made a confidential communication; (2) to a lawyer or his subordinate; (3) for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal

11

proceeding." *Brown*, 151 F.4th at 656; *accord BDO USA*, 876 F.3d at 695. "Ambiguities as to whether the elements of a privilege claim have been met are construed against the proponent." *BDO USA*, 876 F.3d at 695.

Here, it does not appear that the attorney-client privilege protects the ERM File from discovery. While Njigha and the other members of the decision-making team may have intended that the PowerPoint be kept confidential and HR Legal was present during the ERM, it cannot be concluded that the creation of the File was "for the primary purpose of securing either a legal opinion or legal services." *Brown*, 151 F.4th at 656. According to deposition testimony from a Dow representative, "the purpose [of the ERM] is to have a discussion" and to ensure that the decisions made during the meeting are "fair and equitable." Moreover, Njigha created the PowerPoint in order to communicate to legal and non-legal members of the decision-making team the reasons supporting a decision to terminate Oubre's employment, including instances of misconduct. Thus, it appears the primary purpose of the ERM, and the documents prepared in conjunction with the ERM, was business-related, as the participants were tasked with determining whether Oubre should be disciplined or terminated. *See Neuder v. Battelle Pac. Nw. Nat. Lab'y*, 194 F.R.D. 289, 293-94 (D.D.C. 2000) (holding that documents prepared in connection with meetings held by the employer's Personnel Action Review Committee ("PARC") were not covered by attorney-client privilege and noting that the committee "served predominantly a business purpose—terminating the plaintiff," and in-house counsel's presence at the PARC meetings "did not make all documents generated and distributed in connection with the PARC privileged"); *see also United States ex rel. Mitchell v. CIT Bank*, N.A., No. 4:14-CV-00833, 2021 WL 3190556, at *6 (E.D. Tex. July 28, 2021) ("If advice offered by in-house counsel intertwines business and

12

legal advice, attorney-client privilege protects the communication only if the legal advice predominates. Simply labeling communications as 'legal advice' is conclusory and insufficient to satisfy the privilege-proponent's burden.").

While legal counsel may have been present during the meeting, that fact alone does not render all communications or documents prepared for the meeting protected by the attorney-client privilege. *See Dadosky v. Mid-Am. Conversion Servs., LLC*, No. 2:22-CV-02503, 2025 WL 1104560, at *6 (S.D. Ohio Apr. 14, 2025) (holding that the defendant failed to carry its burden to show that the Committee discussions the plaintiff sought to disclose were for the purpose of rendering or soliciting legal advice); *United States v. Inter'l Bus. Mach.'s Corp.*, 66 F.R.D. 206, 213 (S.D.N.Y. 1974) ("If the document was prepared for purposes of simultaneous review by legal and non-legal personnel, it cannot be said that the primary purpose of the document is to secure legal advice."). The fact that the PowerPoint may have been sent to HR Legal also does not render the ERM File privileged. *See Shopify Inc. v. Express Mobile, Inc.*, No. 20-MC-80091-JSC, 2020 WL 4732334, at *3 (N.D. Cal. Aug. 14, 2020) ("[T]he inclusion of an attorney on the communication does not itself bring a document within the privilege's ambit."); *In re Aenergy, S.A.*, 451 F. Supp. 3d 319, 324 (S.D.N.Y. 2020) ("Although a request for legal advice need not be explicit, . . . the implied request for advice must still be the primary reason for the communication in order for the privilege to attach."). Additionally, counsel's participation in the committee's decision-making process further suggests that his or her presence served a business, rather than purely legal, function. *See Marten v. Yellow Freight Sys., Inc.*, No. CIV. A. 96-2013-GTV, 1998 WL 13244, at *9 (D. Kan. Jan. 6, 1998) (noting that an attorney's participation on a committee responsible for determining whether an employee should be

terminated "may lead to an inference that the attorney, at least in part, was acting in a non-legal capacity," and that "the indication is even stronger" when the attorney serves as a voting member of the committee). Therefore, because the attorney-client privilege does not apply to the ERM File, which is relevant to Oubre's claims, it is discoverable.

III.   Conclusion

Consistent with the foregoing analysis, Oubre's Motion to Compel Discovery Responses (#23) is GRANTED. Dow must produce the OCS Black Specs Results data sheets with photos for the Log-In Group for October 2 and 3, 2024, and the ERM file (PowerPoint) on or before June 27, 2026. Moreover, because Dow has filed a Motion for Summary Judgment (#26) and Oubre has filed a Response (#27), the parties shall have until June 10, 2026, to file supplemental briefing regarding the aforementioned evidence.

SIGNED at Beaumont, Texas, this 12th day of May, 2026.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

14